UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


JULIE M. BYMAN,                          CIVIL NO. 12-385 (RHK/JSM)

        Plaintiff,

v.                                        REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


        The matter is before this Court on cross-motions for summary judgment.  [Docket

Nos. 10 and 15].   Plaintiff is represented by Gary A. Ficek, Esq.   Defendant is

represented by David W. Fuller, Esq.  This Court has jurisdiction of the matter pursuant

to 42 U.S.C. § 405(g).   This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C.

§ 636(b)(1)(B) and Local Rule 72.1(c).

## I.    PROCEDURAL BACKGROUND

        Byman  applied  for  disability  insurance  benefits  ("DIB")  on  June  23,  2009.

(Tr. 162-68).   Byman alleged an onset of disability of May 1, 2009 as a result of

seizures,  fibromyalgia,  back  and  neck  pain,  muscle  pain,  fractured  vertebra,

degenerative disc disease, scoliosis, severe osteoporosis, thyroid nodules, skin cancer

and depression.  (Tr. 227).  The Social Security Administration ("SSA") denied Byman's

application on October 2, 2009, (Tr. 97-98), and on reconsideration on January 21,

2010.  (Tr. 99-100).  Byman requested a hearing pursuant to 20 C.F.R. §§ 404.929

et. seq. and 416.1429 et. seq.,  (Tr.110-111), and a hearing was held on February 7,

2011 (Tr. 41-96), before Administrative Law Judge ("ALJ"), Lyle Olson on March 9,

2010.  (Id.)  Byman was represented by counsel.  (Id.).  William Tucker, a vocational expert ("VE") testified at the hearing, as did Byman.  (Id.)

On February 16, 2011, the ALJ issued his decision denying benefits.  On March 21, 2011, Byman sought a review of the ALJ's decision by the SSA's Appeals Council.  (Tr. 40).  On December 22, 2011, the Appeals Counsel denied Byman's request for review, making the ALJ's decision final.  (Tr. 1-6).  See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§404.981, 416.1481.

Byman sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. §405. [Docket No. 1].  The parties have now cross-moved for summary judgment.  [Docket Nos. 10 and 15].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).  The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

## B. Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is

appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.    Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.    DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step process.  At step one, he concluded that Byman had not engaged in substantial gainful activity since May 1, 2009, the date of the alleged onset of her disability.  (Id.).  At step two, the ALJ found that Byman had the following severe impairments: status post C5-6 anterior discectomy and fusion (2003); status post laminectomy and discectomy, right L3 (2010); osteoporosis with a history of compression fractures at T7, T11 and T12; a history of seizure disorder; a remote history of left knee microfracture surgery; and an affective disorder and anxiety-related disorder.  (Tr. 12-13)

At step three, the ALJ found that Byman's impairments did not meet or equal the one the listed impairments of musculoskeletal impairments (Listing §1.00), affective disorders (Listing §12.04) or anxiety disorders (Listing §12.06).  (Tr. 13).

Before considering step four of the analysis, the ALJ determined that Byman had the following residual functional capacity ("RFC"):

> Byman had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567) except that Byman could lift or carry ten pounds occasionally and less than ten pounds frequently; sit (with normal breaks) for a total of about six hours in an eight hour work day; stand or walk (with normal breaks) for a total of about two hours in an eight-hour work day; engage in push/pull actions with the

6

bilateral upper and lower extremities on an occasional basis; occasionally climb stairs/ramps, balance, stoop and crouch; avoid concentrated exposure to extreme cold; and never climb ladders/ropes/scaffolds, kneel, crawl, work at unprotected heights, work with moving mechanical parts or operate a commercial motor vehicle. Byman retained the mental capacity to understand, remember and carry out short, simple instructions; interact appropriately with supervisors, co-workers and the public on a brief and superficial basis; respond appropriately to changes in a routine work setting; and make judgments on simple work-related decisions.

(Tr. 15-16).

In making this determination, the ALJ indicated that he considered all of Byman's symptoms and the extent to which her symptoms could be reasonably accepted as consistent with the objective medical evidence. (Tr. 16). In this regard, the ALJ noted that Byman rated her back pain as a "10" out of "10" from 2008 to the date of a back surgery she had in November, 2010. (Id.). Despite this level of pain, Byman only went to the emergency room once or twice during that time. (Id.). Byman went to physical therapy once a week and reported that ice and heat helped with her pain. (Id.). She experienced headaches about once a week from her neck pain. (Id.). Byman stated that her knee pain was aggravated in cold weather or by overuse and she treated it by elevating her leg and icing her knee. (Id.). As to her history of seizures, the ALJ noted that Byman's last seizure was in 2007.[1] (Id.). Byman took medication for her seizures, without any side effects. (Id.). Byman alleged that she suffered from depression and anxiety, but had not been treated by a psychologist or psychiatrist. (Id.).

The ALJ described Byman's history of employment as a home health aide for a handicapped individual. (Id.). Byman vacuumed, did the laundry, took the client out of

---

[1]    This date appears to be based on Byman's testimony at the hearing. (Tr. 68). As the ALJ noted later in his decision, the seizure took place on July 30, 2008. (Tr. 18).

the house to go shopping or to the library, played cards and worked on puzzles with her. (Id.).   Until her back surgery in 2010, Byman also worked as a cashier at a grocery store.  (Id.).  At this job, she reported that she stood for the entire 4-hour shift and had to stoop and crouch throughout the entire period.  (Tr. 18, citing Tr. 282).   In her descriptions of both jobs, Byman stated that she lifted ten pounds frequently.  (Tr. 18, citing Tr. 281-82).   At the hearing, Byman testified that she could squat, climb stairs, reach overhead, bend to touch her knees, lift ten pounds, walk for no more than one hour, stand for less than two hours, sit for two hours at a time, alternating between sitting and standing after an hour.  (Tr. 18).  Byman stated that if she had a particularly difficult day at work, she would rest for 1-2 hours upon returning home.  (Id.)

The ALJ considered Byman's testimony regarding her daily activities, social functioning and concentration, including that she met her own personal care needs, cared for a pet, performed household chores (making bed, taking out garbage, cooking, vacuuming, washing dishes, sweeping, grocery shopping), visited friends monthly, got along well with others, went to church about every two months, watched TV, parented her 14-year old son every other weekend and for 2 months in the summer, drove approximately 50 miles each way to pick up and return her son to Detroit Lakes, watched movies, played board games with her son, sat through the entire movie, and went out to eat.  (Tr. 18).

The ALJ reviewed the medical records from Byman's treating physicians, examining and non-examining consultants, and third party function reports by Byman's significant other, friend and massage therapists.  (Tr. 18-21).  The ALJ gave only some weight to the RFC physical assessment dated February 1, 2011, completed by Byman's primary physician, Dr. Emil Steinke.  (Tr. 20, citing Tr. 908, 911-18).   In the RFC

assessment, Dr. Steinke stated that Byman could lift less than ten pounds occasionally, less than ten pounds frequently, stand at least two hours in an eight-hour workday, periodically alternate between sitting and standing to relieve pain or discomfort, had limited upper and lower extremities, and could occasionally climb, frequently balance and occasionally stoop, kneel, crouch and crawl. (Tr. 20, citing Tr. 913). The ALJ found that Dr. Steinke's conclusions were inconsistent with Byman's stated activities of daily living, including her ability to maintain her household and work two jobs, one which required her to assist another individual and one which required her to stand for a two-hour or four-hour shift and frequently lift ten pounds. (Tr. 21, citing Tr. 279-87). Additionally, the ALJ noted that Dr. Steinke was a family practitioner, not a specialist. (Tr. 21).

The ALJ gave little weight to the opinion of Byman's treating physician, Dr. Curtis Penney. (Tr. 21, citing Tr. 21F). Dr. Penney completed an RFC questionnaire on Byman on January 24, 2011,[2] which focused on her seizure disorder. (Id.). Dr. Penney stated that Byman was incapable of tolerating even "low stress" jobs and could not operate a motor vehicle. (Tr. 21, citing Tr. 905). The ALJ accepted that Byman could not operate a commercial motor vehicle, but noted that Dr. Penney's opinion conflicted with his treatment notes of October 12, 2009, in which he stated that he could see no medical reason why Byman could not drive, provided she was taking her anti-seizure

_____

[2]     Dr. Penney's assessment dated January 24, 2010. (Tr. 905). Byman's counsel submitted it on February 1, 2011 for use at the hearing and described it as dated "January 24, 2010 (sic? 1/24/11)." (Tr. 901). The assessment references a seizure Byman supposedly had on January 21, 2011, with a question mark beside it. (Tr. 902). For the purpose of this decision, the Court assumed that Dr. Penney completed the RFC on January 24, 2011.

medication. (Tr. 21, citing Tr. 489). Additionally, Dr. Penney's conclusions were inconsistent with Byman's reported activities of daily living. (Tr. 21).

The ALJ considered the RFC assessment prepared on October 4, 2010,[3] by Dr. Marc Eichler, another treating physician. (Tr. 21, citing Tr. 837-47). Dr. Eichler stated that Byman could occasionally lift 20 pounds, frequently lift 10 pounds; stand/walk less than two hours in an eight-hour day, alternating positions; push or pull with her upper or lower extremities less than 20 pounds; climb, balance, stoop, kneel, crouch or crawl only occasionally; and avoid even moderate exposure to hazards such as machinery and heights. (Id.). The ALJ afforded Dr. Eichler's opinion some weight, but did not accept his opinions regarding Byman's ability to stand less than two hours and periodically alternate position, as these opinions were inconsistent with Byman's work as a cashier, for which she stands for her entire two to four-hour shifts. (Tr. 21).

In reaching his RFC determination, the ALJ gave great weight to the State Agency medical consultants' physical assessments dated August 9 and 11, 2009 by Dr. William Paule, and affirmed on January 21, 2010 by Dr. Dan Larson. (Tr. 22, citing Tr. 326-36, 361-63). These consulting physicians limited Byman to lifting ten pounds frequently and occasionally, standing/walking two hours and sitting for six hours out of an eight-hour day. (Id.). The ALJ concluded that these RFC assessments were consistent with the record as a whole, particularly Byman's self-reported daily living activities, and her description of working jobs that required lifting 10 pounds frequently and standing up to 4 hours at a time. (Tr. 22). The ALJ also considered the consulting examination of Byman by Dr. Mark Yohe on August 4, 2009, in which Dr. Yohe noted

---

[3]    The Court notes this assessment was done before Dr. Eichler performed surgery on Byman's back on November 30, 2010. (Tr. 849-57).

limitations of 10 pounds, and recommended against working around dangerous machinery because of her seizure disorder. (Tr. 20, citing 446).

The ALJ also considered the opinions by Dr. Steinke, State Agency consulting and examining psychologist, Ronald Odden, and the State Agency psychological consultants, Dr. Nelsen and Dr. Alsdurf, regarding Byman's mental impairments. (Tr. 21-22). The ALJ noted that Dr. Steinke placed on Byman mild restrictions on activities of daily living, no difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 22, citing 929). The ALJ gave this opinion some weight because he determined that Byman's social functioning was more limited that found by Dr. Steinke. (Tr. 220). Based on his examination of Byman, Odden had assigned Byman a GAF score of 58, indicating an individual with some moderate symptoms or moderate difficulty in social, occupational or school functioning. (Tr. 21, citing Tr. 450, Diagnostic and Statistical Manual of Mental Disorders IV). Odden concluded that Byman could understand, remember and follow 3-step instructions, would have no difficulty dealing with co-workers or supervisors, and would be able to handle the stress of an entry level job. (Tr. 21, citing Tr. 450). The ALJ afforded these opinions some weight as they were consistent with the record as a whole, including Byman's activities of daily living and history of employment. (Tr. 21-22).

Dr. Nelsen and Dr. Alsdurf indicated limitations with regard to instructions, contact with others and making judgments on work-related decisions. (Tr. 22, citing Tr. 356). The ALJ gave great weight to their opinions, because they were consistent with the record as a whole, including Byman's activities of daily living. (Tr. 22).

The ALJ acknowledged that Byman would experience some symptoms and limitations as a result of her impairments and reduced her RFC accordingly. (Id.).

At the fourth step of the analysis, the ALJ determined that Byman could not perform past relevant work, such as working as a cashier, a receptionist or a home health care aide. (Tr. 23, citing Tr. 321).

At the fifth step, the ALJ relied on VE's testimony that, given Byman's age, education, work experience and RFC, she could perform representative occupations such as assembler or bonder, which exist in significant numbers in the national economy. (Tr. 24). The ALJ found the VE's testimony consistent with information from the Dictionary of Occupational Titles ("DOT"). (Id.).

## IV.  RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY[4]

### A.  Medical Records

Byman has a medical history of seizures, cervical and lumbar spine disorders, depression and anxiety.

In March, 2009, Byman's primary care physician Dr. Steinke referred Byman to a pain clinic, where Byman was seen by Dr. Latif Ougzin on March 26, 2009. (Tr. 409). She described her pain as primarily located on the right lumbosacral region, right thoracic region and sometimes in the right cervical area, and that it was aggravated with

---

[4]     The Court notes that Byman has a medical history of thyroid nodules. (Tr. 400-02). However, because Byman has not ascribed any error to the ALJ on the basis of this medical condition, the Court will not review that portion of the medical record in any detail. Any claim regarding this impairments is waived. See Craig v. Apfel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir.1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (finding failure to raise an issue before this Court results in waiver of that argument)); Stanek v. Astrue, Civ. No. 10-4870, 2011 WL 6987177 at *1 n. 1. (D. Minn. Dec. 23, 2011) ("The Court need not address arguments that a party failed to raise or discuss in its brief because waiver is 'deemed an abandonment of that issue." Jasperson v. Purcolator Courier Corp., 765 F.2d 736, 740 (8th Cir.1985); see Hacker v. Barnhart, 459 F.3d 934, 937 n. 2 (8th Cir.2006) (citing Jasperson in determining waiver); see also Mark v. Ault, 498 F.3d 775, 786 (8th Cir.2007) (quoting Hacker, 459 F.3d at 937 n. 2) (holding failure to raise or address an issue constitutes abandonment)).

sitting, standing, changes in weather, bright lights, rolling in bed and climbing stairs. (Tr. 409-10). Dr. Ougzin noted tenderness in the cervical area all the way to the lumbosacral region; obvious curvature to the right with pain over the right scapular; rotation, flexion, and extension of the lumbar spine was negative; FABER and Lasegue tests[5] were negative; lower extremity strength was 5/5 for each side and no motor or sensory deficit. (Tr. 411). Dr. Ougzin ordered cervical, lumbar, and thoracic MRIs and a bone density scan. (Tr. 412). Dr. Ougzin indicated that Byman had possible scapular bursitis and "multiple sources of pain due to either compression fracture or dextrorotational spine." (Tr. 412).

On April 9, 2009, MRIs and x-rays were taken. The cervical MRI showed moderate central canal stenosis at the C4-C5 disk and moderate to severe right lateral recess stenosis. (Tr. 397). The thoracic MRI showed small disc protrusion at C6-7, and end compression fractures at T7, T11 and T12. (Id.). The thoracic x-rays showed compression fractures at T7, T11 and T12, lumbar x-rays showed degenerative disk disease at T12-L1, L2-L3 and L3-L4, and the lumbar MRI showed a right L2-L3 herniated disk. (Id.) The bone scan results were consistent with osteopenia. (Id.).

At a follow-up visit with Dr. Ougzin in April, 2009, Byman reported that her pain was severely compromising her daily activities; she had pain in her lumbar, hip, right scapular and mid-thoracic areas; and she could not bend, extend or rotate due to pain. (Tr. 366). Dr. Ougzin diagnosed osteoporosis, compression fractures, and degenerative

---

[5] The FABER (Flexion, Abduction and External Rotation) test evaluates the pathology of the hip joint or the sacroiliac joint. See Miller-Keane Encyclopedia & Dictionary of Medicine & Allied Health 648 (7th ed. 2003). The Lasegue test evaluates the aggravation of pain in the lower limb and back from passive heel raise with knee straight. Id. at 1010.

disc disease. (Tr. 368). Dr. Ougzin recommended that she undergo a lumbar epidural steroid injection. (Id.).

On May 13, 2009, Byman was scheduled to have a lumbar steroid injection but the procedure had to be stopped at her request. (Tr. 381, 386).

On May 28, 2009, Byman completed a medical history form on which she noted that she was walking every day for an hour. (Tr. 622).

June 26, 2009, Byman saw Crystal Cossette, a physician's assistant, for an evaluation of chronic pain throughout her spine. (Tr. 394). Byman stated that in July 2007, she injured her back helping a client get up and since that time has had severe back pain from her shoulder blades down to her tailbone. (Id). Byman also reported that she had a seizure in July 2008 and fell to the floor. (Id.). She is on medication and has had no further seizures. (Id.). Byman said her pain was worse when she stood for long periods of time; she currently works as a program aide; and by the end of the shift her pain is extremely severe. (Tr. 395). She reported that she had physical therapy and responded well to massage and ultrasound. (Id.) On physical exam, Cossette indicated that Byman walked with a normal gait and station; had no difficulty getting up from a seated position; her range of motion in her neck and back was full and painless; she showed no pain on percussion to her spine at any vertebral level; right-sided paraspinal spasm was present; she showed no tenderness over facet joints, SI joints or hip joints; her mechanics were normal; motor examination in upper and lower extremities were 5/5 in all muscle groups; she walked on both heels and toes and performed tandem gait without difficulty; her neurological exam was negative; and there was no apparent atrophy of any muscle groups. (Tr. 396). Byman was started on pain

medication and was referred to physical therapy for ultrasound, massage, ice, heat and a trial with a TENS unit. (Tr. 398).

On July 16, 2009, Byman saw Dr. Steinke who noted that her "main concern today is the pain which is fairly severe and disabling for her, although she is working two jobs. She rates her pain as a 10/10." (Tr. 485). Dr. Steinke recommended a nerve conduction study and sought a second opinion regarding surgical options from Dr. Eichler. (Tr. 486).

On July 30, 2009, Dr. Dennis Sollom conducted a nerve conduction study on Byman. (Tr. 457-65). Byman reported that she was in pain all day, but that she had never received psychological or psychiatric counseling for her pain. (Tr. 457). Byman stated that she had never missed time from work, and that she tried to be as active as she could and works through her discomfort. (Id.). Dr. Sollom noted that Byman "remains independent with all of her self-care skills. Does not need any assistance with stair climbing, driving, grocery shopping, housekeeping or lawn work." (Tr. 459). During the exam, Byman was able to get on and off of the exam table, move around the room and stand and balance on either leg alone without difficulty. (Tr. 460). Byman's straight leg raising tests were normal, she had good balance, and the tests Dr. Sollom performed on Byman's cervical spine and thoracolumbar spine did not produce pain. (Tr. 461). Byman had mild limitation of her range of motion of her cervical spine and mild to moderate limitation of her range of motion of her thoracolumbar spine. (Tr. 463). Dr. Sollom interpreted the EMG study as "minimally abnormal" and consistent with distal right deep peroneal motor neuropathy. (Tr. 464). "Otherwise, there is no definite evidence for a radiculopathy, plexopathy, polyneuropathy or other significant peripheral nerve entrapment syndrome involving upper or lower extremities." (Id.).

On September 2, 2009, Byman was seen by Dr. Eichler for her neck pain and right upper extremity pain in her trapezius and shoulder. (Tr. 477). Dr. Eichler recommended a C-5 nerve root block. (Tr. 479). If the block was not successful and her symptoms continued, Dr. Eichler indicated that he would consider surgery. (Id.). On September 14, 2009, the nerve block was performed, (Tr. 466- 67).

On October 12, 2009, Byman saw Dr. Penney for a follow-up regarding her seizures. (Tr. 488-90). Dr. Penney noted Byman's concern about driving and told her that he saw "no medical reason that she cannot drive a motor vehicle as long as she is faithful to her antiepileptic medication. . .there is no medical impediment to her driving a motor vehicle." (Tr. 489). Dr. Penney noted that Byman's seizure disorder was "well-controlled." (Id.).

On October 16, 2009, Byman saw Cossette for a follow-up to the nerve root block. (Tr. 482). Byman reported to Cossette that she got no relief from it. (Tr. 482). Cossett indicated that Byman sat with a normal posture, could stand without difficulty, her range of motion of her neck was full and painless, and the neurological exam was normal. (Tr. 482-83). Cossette recommended a C6 nerve block. (Tr. 483, 636). At a follow-up exam with Cossette on November 18, 2009, following this second nerve block, Byman reported that her right arm symptoms had completely resolved and she was pain free in her right arm. (Tr. 720).

Byman returned to Cossette on January 14, 2010, reporting that her pain had returned after the C6 nerve block. (Tr. 710). Cossette referred Byman for further injections, which Byman received in February, March and April, 2010 (Tr. 766-73).

On May 20, 2010, Byman saw Dr. Steinke for a follow-up regarding her back pain. (Tr. 688-90). Dr. Steinke noted that Byman's work as a health care aide entailed

a "fair amount of physical work" and Byman rated her pain as a "9" out of "10." Byman also told Dr. Steinke that she had applied for disability benefits. (Tr. 688-89). At the same appointment, Dr. Steinke noted that Byman had some pain with range of motion of the back, but that her range of motion was well maintained, and her straight leg raising was negative. (Tr. 689).

On August 10, 2010, Byman saw Dr. Eichler for right-side low back pain. (Tr. 665). On exam, Dr. Eichler noted that straight leg raising was negative bilaterally; she had no back spasms; she had pain with extension and flexion; there was tenderness around the SI joint; and hip mechanics were negative. (Tr. 666). Her neurological exam was basically unremarkable except for subtle weakness in the right hip and quadriceps muscles. (Id.) On September 8, 2010, Byman saw Dr. Steinke for fatigue and she told him that her back pain continued to bother her, but that "she is getting by." (Tr. 869).

On October 2, 2010, Dr. Eichler completed an RFC assessment on Byman in which he opined that Byman could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk less than two hours a day; must periodically alternate between sitting and stand; could push or pull in her upper and lower extremities less than 20 pounds; could occasionally perform postural activities (climb, balance, stoop, kneel, crouch, crawl); and should avoid even moderate exposure to hazards (machinery, heights). (Tr. 838-43).

Byman underwent an L3 nerve block on October 4, 2010. (Tr. 890). On November 7, 2010, she reported to Dr. Eichler that this helped her pain for about two weeks. (Tr. 858). Byman sought an opinion from Dr. Eichler on surgery. (Tr. 859). Dr. Eichler's exam showed a negative bilateral straight leg raise, but back pain was

present with extension and flexion, lateral bending and rotation. (Id.). Dr. Eichler told Byman that a right L2-L3 diskectomy may relieve her lower right extremity complaints. (Tr. 860).

On November 30, 2010 Byman underwent a diskectomy and forminotomy at L2-L3. (Tr. 849-57). On December 20, 2010 Byman reported to Dr. Steinke that she was "feeling quite a bit better" but that she still had right low back pain. (Tr. 865). Dr. Steinke refilled Byman's prescription for Percocet, but noted "no refills" and "try to wean her off that." (Id.).

On January 17, 2011, Dr. Steinke saw Byman in connection with Byman's application for disability benefits. (Tr. 907-08). Dr. Steinke's assessment was that Byman had an extensive history of degenerative changes of the entire spine involving cervical, thoracic and lumbar region with ongoing chronic pain. (Tr. 908). He noted that she was on work restrictions with lifting limited to less than 10 pounds per Dr. Eichler. (Id.) Dr. Steinke opined that Byman's "ability to work is certainly limited" and that he "support[ed] her application for disability. She has been on narcotics intermittently for her pain. Currently she is off them." (Id.).

On January 24, 2011, Dr. Penney completed an RFC assessment on Byman. (Tr. 902-06). In response to the question "what are the dates of the last three seizures?", Dr. Penney wrote "? 1/21/11" and "7/30/08." (Tr. 902). Dr. Penney indicated that Byman would not have to take unscheduled breaks during an 8-hour day. (Tr. 905). At the same time, he indicated that she was incapable of holding even a "low

stress" job. [6]  (Tr. 905).  Dr. Penney opined that Byman could not now operate a motor vehicle because of Byman's alleged recent seizure.[7]  (Tr. 904).

On February 1, 2011, Dr. Steinke completed an RFC Assessment on Byman. (Tr. 911-32).  Dr. Steinke opined that Byman could lift less than ten pounds; could stand at least two hours out of an eight-hour a day; must alternate between sitting and standing; and could occasionally perform postural activities, with the exception of balancing, which she could perform frequently.  (Tr. 912-13).  In support of these conclusions, he referenced her low and mid-back pain with these activities, degenerative disc disease, thoracic compression fracture, scoloisis, and recent L3 right laminectomy and diskectomy.  (Tr. 912).  Dr. Steinke also completed a Psychiatric Review Technique Form on Byman's behalf.  (Tr. 919-32).  Dr. Steinke stated that Byman had depression and anxiety and indicated that she had mild restrictions of daily living, none difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence or pace.  (Tr. 920, 924, 929).

## B.   State Agency Reviewing Physicians and Psychologists and Consultative Reports

On August 3, 2009, State Agency consulting psychologist Ronald Odden M.A. conducted an examination of Byman, and completed a Mental Status Examination and Description of Daily Functioning assessment of Byman.  (Tr. 448-50).  Odden noted Byman's history of back pain and her reports that she could not stand for more than an hour, and walking for more than an hour increased her back pain. (Tr. 448).  Byman

---

[6]   The Court notes that Dr. Penney's stated rationale for this conclusion is illegible. (Tr. 905).

[7]   There is no medical evidence corroborating Byman's self-report of a seizure on January 21, 2011, and no evidence in the record that she sought treatment for such a seizure.

further stated that she became uncomfortable if she sat for more than thirty minutes at a time. (Id.). Byman told Odden that she had no seizures since being prescribed Keppra in recent months. (Id.). Byman described her daily activities to Odden as follows. Byman woke at 9:00 a.m., showered and dressed independently. (Id.). She worked from 11:00 a.m. to 2:00 p.m. as a health aide. (Id.). When her shift was over, Byman went home, made lunch, did dishes or a load of laundry. (Id.). She often spent the afternoon with her younger son, going to a go-cart track or mini-golf. (Id.). Some afternoons she went to her boyfriend's house to play with his new puppies and some afternoons she took her son and a friend to the community pool. (Id.). They returned home at about 4:30 p.m. and Byman rested before starting supper. (Id.). After supper, Byman visited with her son or mowed the lawn. (Id.). Byman reported that she drove without limitations, could manage her own finances responsibly and could concentrate on a task for two hours at a time. (Id.).

In general, Odden found Byman to be oriented and coherent. (Tr. 449). Byman's memory was average, her knowledge of current events was average and her ability to understand abstract concepts was average. (Id.). Her insight and judgment were below average and she was of average intelligence. (Id.). Odden's diagnosis was major depressive disorder, recurrent, mild, and anxiety disorder, not otherwise specified. (Tr. 450). Odden assigned Byman a GAF score of 58 and noted that Byman "would have no difficulty dealing with coworkers or supervisors on a typical entry-level job. (Id.). Based on testing he conducted, he concluded she could understand, remember and follow instructions on tasks with three steps, her attention span was average, she could sustain attention on tasks for two hours at a time, her pace on tasks was average and she was able to complete most tasks she initiated. (Id.). He

concluded that the stress and pressure found on a typical entry-level job would not cause a significant increase in anxiety or depressive symptoms for Julie at the present time." (Tr. 450).

On August 4, 2009, Dr. Mark Yohe performed a consultative physical examination of Byman in connection with her application for benefits. (Tr. 442-47). Dr. Yohe's exam notes indicated that Byman told him that since she suffered a seizure in 2008, she thought she was having "spells" every day during which she gets dizzy and has blurred vision. (Tr. 442). These "spells" last about five minutes and she has no memory of the events. (Id.). Byman told Dr. Yohe that she could not stand for more than two hours at time before having to rest and ice her back and that she could only sit for thirty minutes at a time. (Id.) She did not know how far she could walk, and stated that she fatigued easily when doing daily activities and had to rest. (Id.). Byman reported that she never lifted more than ten pounds and had stopped driving due to her history of seizures. (Id.). Dr. Yohe noted that Byman complained of back, neck, joint and muscle pain and muscle weakness, as well as depression and anxiety. (Tr. 444). Byman rated her pain as a "9" out of 10, with "10" being the "worst possible pain" all over her body. (Tr. 445). He noted that she said she could stand for 2 hours, but was limited in sitting for 30 minutes and then needed to rest. (Tr. 446.).

Dr. Yohe's exam showed Byman to be mentally alert and oriented. (Id.). She exhibited myofascial pain and tenderness on the right side of her thoracic spine and into her sacroiliac joint region. (Id.). Byman's upper and lower extremity range of motion were within normal limits. (Id.). Byman's heel walking, toe walking and tandem walking were all normal and her rapid, alternating movements were normal. (Id.). Dr. Yohe found Byman's high cerebral functioning to be normal and she had no sensory or motor

defects.  (Id.).  Dr. Yohe recommended that Byman not be around hazardous machinery because of her seizure history and he noted that further evaluation was needed if a neurologist felt she was having seizure activity.  (Id.).

On August 11, 2009, State Agency medical consultant Dr. William Paule completed an RFC assessment on Byman.  (Tr. 329-36).  Dr. Paule stated that Byman could occasionally and frequently lift ten pounds, stand and/or walk at least two hours in an eight-hour day and sit about six hours.  (Tr. 330).  Byman's push/pull ability was unlimited except for the previously noted lift/carry limitations.  (Id.).  Dr. Paule further concluded that Byman could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, frequently balance, and could never climb ladders, ropes or scaffolds. (Tr. 331).  Dr. Paule found no environmental limitations applied, with the exception of hazards, such as machinery or heights.  (Id.).  On January 21, 2010, Dr. Dan Larson affirmed Dr. Paule's RFC Assessment.

On October 2, 2009, State Agency consulting psychologist Dr. R. Owen Nelsen completed a Psychiatric Review Technique form, (Tr. 340-53), and indicated that Byman had recurrent and mild depressive disorder and an anxiety disorder, not otherwise specified.  (Tr. 345).  Dr. Nelsen indicated that Byman had only "mild" restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  (Tr. 356).  Dr. Nelsen's notes indicated that Byman was not currently receiving psychiatric services, and she reported that she was living with her sons at home, where she cooked, cleaned and did basic chores daily and weekly as needed.  (Tr. 352).  Byman reported that her desire to engage in daily activities was lower than it had been in the past and that she often felt tired during the day.  (Id.).  In

terms of her cognition, Dr. Nelsen found that Byman was oriented to person, place and time, her attention span, remote memory and abstractive capacity were average, her judgment and insight were low average, and she was of average intelligence. (Id.).

Dr. Nelsen determined that Byman could understand, remember and follow instructions for three-step tasks and could sustain attention on tasks for two hours at a time. (Id.). Byman's pace on tasks was average and she was able to complete most tasks she initiated. (Id.). Dr. Nelsen concluded that "Julie would have no difficulty dealing with coworkers or supervisors on a typical entry-level job. The stress and pressure found on a typical entry-level job would not cause a significant increase in anxiety or depressive symptoms for Julie at the current time." (Id.).

Dr. Nelsen also completed a Mental RFC on Byman. (Tr. 354-60). Dr. Nelsen found Byman not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short simple instructions. (Tr. 354). Byman was moderately limited in her ability to understand and remember detailed instructions. (Id.). Dr. Nelsen further found Byman moderately limited in her abilities to carry out detailed instructions; to perform activities within a schedule; to maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and without an unreasonable number of rest breaks; to interact appropriately with the public and to respond to changes in the work place. (Tr. 354-55). In all other areas encompassing understanding and memory, sustained concentration and persistence, social interactions and adaption, Dr. Nelsen found Byman not significantly limited. (Tr. 355).

In summarizing Byman's mental RFC, Dr. Nelsen noted that Byman's ability to handle supervision would not be significantly limited but her ability to deal with co-workers and the public would be somewhat restricted, and her ability to deal with workplace stress would be somewhat reduced. (Id.). On January 21, 2010, State Agency consulting psychologist Dr. James Alsdurf affirmed Dr. Nelsen's assessments. (Tr. 358-60).

## V. REPORT BY BYMAN AND HEARING TESTIMONY

### A. Report by Byman

Byman completed a work history report on July 5, 2009, in which she described her jobs as a program assistant for a health agency and cashier. (Tr. 280-87). She reported that her duties as a program assistant included working with disabled patients, and bringing them to stores, appointments, and light housekeeping. (Tr. 281). She indicated the heaviest lifting on this job was ten pounds, and she frequently lifted ten pounds. (Id.) She also indicated that at this job she walked 3 hours, stood three hours, sat one hour, climbed one hour and stooped 2 hours. (Id.) In her cashier job, Byman stated that during her four-hour shift she stood the entire time, waited on customers and lifted and handled their groceries. (Tr. 282). She indicated that the heaviest weight she lifted was 10 pounds and that she frequently lifted ten pounds. (Id.).

### B. Hearing Testimony

Byman testified that she had two sons, ages 27 and 14. (Tr. 48). Her older son was living with her and she had visitation rights with her younger son, who spent every other weekend with her and two months in the summer. (Id.). Byman was living in a house that required her to go up fifteen stairs to her bedroom and fifteen stairs to the basement to do laundry. (Tr. 49). At the time of the hearing, Byman was working as a

24

home health aide caring for a woman with Down Syndrome and was working a seventeen-hour shift, once a week, which included an overnight and another shift of seven hours. (Tr. 52, 53). Byman had been doing this work since 2007. (Tr. 53). Byman helped the woman get dressed and helped with household chores such as fixing meals, putting dishes away, vacuuming, laundry and assisting the woman in community activities, such as taking her on trips to Walmart, Target or the public library. (Tr. 54). Byman testified that after doing chores such as vacuuming or the laundry, she would have to sit for ten to fifteen minutes. (Id.).

Byman also worked as a cashier, including after the onset date of May 1, 2009, but had not been back to her job since having her surgery in 2010. (Tr. 55). When she was working as a cashier, her supervisor had wanted her to work a six-hour shift, but she considered that too strenuous; ultimately, she worked a two-hour shift one day a week and a two-hour shift every other Saturday, for a total of four hours per week. (Tr. 55-56). In addition, in May, 2009, while Byman was not working fulltime as a home health aide, she did fill in extra shifts for others. (Tr. 57).

As to her physical impairments, Byman testified that her most severe physical problem was her low back. (Tr. 60). Byman had back surgery in November, 2010, and returned to work the first week in January, 2011, although she stated that she was very fatigued. (Tr. 61). Byman admitted that after her surgery her low back pain had improved and she was doing physical therapy. (Tr. 61). She experienced a "slight" burning when she bent over to pick up laundry. (Id.). In addition, the surgery helped alleviate pain she had in her right leg. (Id.).

The ALJ asked Byman to rate her back pain before the surgery, with "10" being pain so severe that she would need to go to the emergency room. (Tr. 62). According

to Byman, her pain was "always" a "10," ever since a workplace accident in 2008 when a client fell on top of her. (Id.). Since the surgery, she rated her pain as a "7." (Id.). Byman took Percocet for her back pain, but testified that the medication did not really help her—she took it because she "believe[d] in my mind it might help." (Tr. 63). Ice and heat packs did help her and she believed that physical therapy was helping her with back spasms. (Id.). Byman was doing the home exercises that had been recommended. (Tr. 64).

Byman testified that she experienced headaches once a week, about an hour in duration. (Id.). The headaches would be preceded by neck pain, which lasted about as long as the neck pain. (Id.). Byman had neck surgery in 2003 and testified that she had not had any injections in her neck since her alleged date of onset in May, 2009, nor had she had any physical therapy for her neck pain since then. (Tr. 65). Byman rated her neck pain as "6" and her headache pain as "5." (Id.). She "sometimes" took Ibuprofen to help with her headache pain. (Tr. 66).

Byman indicated she had pain in her right knee that limited her ability to work. (Id.). Byman stated that the pain in her knee "came and went" and that cold weather and overuse would trigger the pain. (Id.). When her knee was "acting up," Byman rated her pain at "9 to 10," although she also testified that she had never been to an emergency room for her knee pain. (Id.). When experiencing that level of pain, Byman testified that she would put her knee up, rest it and put ice on it. (Tr. 67). Byman had not sought any treatment for her knee pain since 2008. (Id.).

As to other limiting conditions, Byman testified that the fractures in her vertebra "fatigued" her, her scoliosis played a role in her fatigue, and she believed that two months before the hearing she had begun having seizures at night, although she also

testified that she had not otherwise had a seizure since 2007.  (Tr. 68).  Byman took Keppra to control her seizures.  (Id.).

Byman testified that she believed her depression limited her ability to work and Dr. Steinke, her family practitioner, was treating her for depression.  (Tr. 69).  Byman was not being treated by a psychologist or psychiatrist for depression.  (Tr. 69, 71).  Byman could not recall the medication she was taking for her depression, but stated that she "hoped" it was working, but was not sure.  (Tr. 70-71).

Byman stated that she saw friends once a month, did not belong to any clubs or social organizations, tried to go to church once every two months, did not go out to local activities such as concerts, and had no problems getting along with supervisors or co-workers.  (Tr. 71-72).  Byman stated that she had trouble concentrating, but that when she watched television she could follow the storyline and plot.  (Tr. 72-73).  She read magazines for pleasure and could understand what she was reading.  (Tr. 73).  She played card games and puzzles with clients and had a computer and internet access at home, although it was not working at the time of the hearing.  (Id.).

Byman's fourteen-year-old son stayed with her every other weekend and she drove from Moorhead, Minnesota to Detroit Lakes, Minnesota to return her son, a fifty-mile trip.  (Tr. 73).  Byman and her younger son went to the movies, played board games, went out to eat, and she sat and watched him play computer games.  (Tr. 74).

The ALJ asked Byman about her daily activities.  Byman testified that she typically got up at 9:00 a.m., let her dog out and showered.  (Tr. 75).  Sometimes she went to appointments.  (Id.).  She got dressed every day, ran errands sometimes, such as grocery shopping, and went to her doctor's appointments.  (Id.).  In the evenings, she cooked supper and watched television.  (Tr. 76).  Byman cared for all of her personal

needs without assistance, such as bathing, making her bed, cooking, vacuuming, washing dishes, doing laundry, washing clothes, and caring for her dog.  (Tr. 76-77).  Byman told the ALJ that she enjoyed going to the movies and going out to eat.  (Tr. 77).  Byman testified that she could drive fifty minutes at a time before stopping, could not lift more than ten pounds, and could walk for an hour at a time.  (Tr. 77-78).  She could stand for an hour at a time and could sit for up to two hours, although doing so was uncomfortable.  (Tr. 78).  Finally, Byman stated that she could bend over and touch her knees, squat, climb a flight of ten to twelve steps, reach overhead, and do buttons and zippers with her hands.  (Tr. 79-80).

In response to questioning from her lawyer, Byman stated that during a seven-hour shift with her disabled client, she was able to sit for two to four hours with her feet up.  (Tr. 81).  She further stated that she could sit through an entire movie, but had to shift positions, was stiff afterwards and sometimes had increased pain.  (Tr. 81-82).

Byman's lawyer asked her about the extra shifts she was working in 2009 and whether the extra work affected her back.  (Tr. 82).  Byman responded that she had a bad memory, but was sure that the work affected her back.  (Id.).  Byman's lawyer asked her if she believed she was capable of working full time at a sedentary job with a sit/stand option and Byman responded that she could not, because she would be exhausted and her pain would increase.  (Tr. 84).  Further, Byman was taking Percocet three times a day and testified that it made her tired and "possibly" confused.  (Tr. 86).

The ALJ posed the following hypotheticals to the VE.  First, the ALJ asked the VE to assume an individual with Byman's age, education and past work experience, and to assume that the individual was able to lift ten pounds occasionally, less than ten pounds frequently, was able to sit with normal breaks for a total of about six hours in an

eight-hour work day; stand and/or walk with normal breaks for a total of only two hours in an eight hour work day; occasionally reach overhead with bilateral extremities; occasionally engage in operating foot controls bilaterally; occasionally climb stair and ramps, balance, stoop and crouch, but who could never climb ladders, ropes or scaffolds, kneel, crawl, work at unprotected heights, work around mechanical parts, or operate a commercial motor vehicle; and would need to avoid exposure to extreme cold. (Tr. 90). From a mental standpoint, this individual could consistently and reliably understand, remember and carry out short simple instructions; interact appropriately with supervisors, coworkers and the public on a brief and superficial basis; respond to appropriate changes in a routine work setting; and make judgments on simple work-related decisions. (Tr. 90-91). The ALJ asked the VE to exclude Byman's past semi-skilled and skilled work. (Tr. 91). The VE responded that at the sedentary, unskilled level the individual could work as an assembler or bonder in the electronics industry, jobs consistent with the DOT. (Id.).

The ALJ next asked the VE to make all of the same assumptions, except that over an eight-hour work day, the individual would need to alternate between sitting and standing every hour. (Tr. 91-92). The VE testified that the individual would not be able to work as an assembler or bonder. (Tr. 92).

Finally, the ALJ asked the VE to assume all of the conditions of the first hypothetical, but to assume that the individual could lift less than ten pounds occasionally and frequently. (Tr. 92). The VE responded that eliminating the ability to lift ten pounds occasionally would erode the jobs available at the sedentary level. (Id.).

Byman's lawyer asked the VE about the effects of narcotics on the hypothetical individual working as an assembler or bonder. (Tr. 93). That is, would the use of

narcotics on regular basis preclude such work? (Id.). The VE stated that he believed that the issue was a medical issue but that such narcotic use "does raise issues that would need to be resolved, yes." (Id.). The ALJ then followed up on this line of questioning:

> ALJ:  [I]f an individual is working, is hired for a job already, right and then they have an injury that requires them to take this medication. . .but say there's no side effects, they're just taking the medication.  It helps them get through their day, there's no side effects that are discernible to the employer.  Are you saying that this individual would be fired?
>
> VE:  No, I don't think they would be fired.  I think that as long as they were able to concentrate doing their work and not be a hazard to other people, it probably wouldn't be a problem, but I don't think the answer to that question would be primarily a vocational one.  I think it would have to be primarily a medical one.

(Tr. 94).

## VI.   DISCUSSION

Byman challenged the ALJ's decision on three grounds.  First, the ALJ erred in failing to give proper weight to the opinions of her three treating physicians, Dr. Steinke, Dr. Eichler and Dr. Penney.  Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem.") [Docket No. 20], pp. 9-17.  Dr. Steinke was Byman's primary care physician and treated her numerous times between May 20, 2009 and January 17, 2011. Id., p. 10.  Dr. Steinke diagnosed Byman's C4-5 disc herniation with spinal stenosis, L2-L3 disc herniation with nerve impingement, and T7 and T12 compression fractures. Id., p. 11.  According to Byman, Dr. Steinke "objectively" verified Byman's pain and his treatment plans were consistent for someone experiencing "severe pain." Id., p. 12.  Further, the ALJ's expressed reasons for rejecting Dr. Steinke's opinion – that it was inconsistent with her daily living activities and

Dr. Steinke was not a specialist – was belied by the record on her daily activities, the fact that she only worked part-time, and the other physicians upon whom the ALJ relied were not identified as specialists.  Id., p. 14.  Byman argued that had the ALJ given Dr. Steinke's opinion "great" or "controlling" weight, he would have concluded that Byman was disabled.  Id., p.. 13; see also Plaintiff's Rebuttal Memorandum ("Pl. Reply"), p. 2 [Docket No. 17].

Dr. Eichler was Byman's orthopedic surgeon and performed a L2-L3 discectomy and laminectomy on Byman.  Id., p. 15.  Byman argued that the ALJ's reliance on her ability to stand for her entire shift as a cashier, was not sufficient reason to "disregard" Dr. Eichler's opinion that Byman would have to alternate sitting and standing.

Dr. Penney opined that Byman could not work a low stress job or drive a car — an opinion the ALJ afforded "little" weight as it was inconsistent with Byman's work history, daily living activities and Dr. Penney's own opinion rendered a year earlier that Byman could drive.  Id., p. 16.  Byman asserted that the ALJ inadequately explained how this evidence proved Byman's ability to handle the stress of a full time job.  Id.

Conversely, Byman maintained that the ALJ gave too much weight to the opinions of the State Agency reviewing physicians, Dr. Paule and Dr. Larson, because "their opinions were provided under contract with the SSA before much of the evidence in the case had been developed."[8]  Pl. Mem., p. 10.

Second, Byman argued that the ALJ's decision was not supported by substantial evidence in the record as a whole because there was only "scant" evidence to support a

---

[8]    The Court notes that Byman did not cite to any evidence developed after Dr. Paule and Dr. Larson rendered their opinions that she believed was significant.

conclusion that Byman's impairments did not restrict her at the levels described by Dr. Steinke and Dr. Eichler.[9] Id., pp. 17-18; Reply, pp. 2-5.

Third, Byman contended that the ALJ erred in assessing Byman's subjective complaints of pain because he did not specifically address the "Polaski"[10] factors in his decision. Moreover, there is no support in the record that she was exaggerating her pain or malingering and the record was "replete" with evidence that Byman was suffering from severe pain. Id., p. 19.

In response, the Commissioner argued that substantial evidence in the record supported the ALJ's weighing of Byman's treating physicians' opinions. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.") [Docket No. 16], pp. 9-18. The Commissioner did not dispute that these physicians treated Byman for her physical impairments, but noted that treatment for impairment did not equate to proving a disability. Id., p. 11. Further, the ALJ properly accounted for Byman's work history, acknowledging the part-time nature of her work and her limitations, which affected her ability to work. Id., p. 13. The Commissioner rejected Byman's contention that there was no evidence that she had abilities in excess of Dr. Steinke's assessment, arguing that her admission that she could stand for a four-

---

[9]     To the extent that Byman also inferred that the failure of the ALJ to address Byman's use of narcotics was an error, (Pl. Mem. p. 18), the Court finds that there is no evidence in the record to support the suggestion that her medication affected her ability to perform her work. Further, the VE opined that "as long as they were able to concentrate doing their work and not be a hazard to other people, it probably wouldn't be a problem." (Tr. 94).

[10]     As discussed in more depth, infra, the Eighth Circuit in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)) described the factors the ALJ must consider in assessing a claimant's subjective complaints of pain.

hour shift directly contradicted Dr. Steinke's opinion that she could only stand for two hours out of an eight-hour day. Id., p. 14 (citing Tr. 912).

Similarly, Dr. Eichler's opinion that Byman could only stand two hours out of an eight-hour day was contradicted by Byman's work history report, in which she stated that she stood "the whole time" during her four-hour shifts. Id., p. 16 (citing Tr. 282). In addition, the Commissioner maintained that the ALJ properly considered Dr. Steinke's lack of specialization in deciding to give his opinion less weight, because if a treating physician is not familiar with a claimant's impairments, his opinion may be given less weight. Id., p. 15 (citations omitted).

As to Dr. Penney's opinion that Byman could not tolerate even a low stress work environment or drive a car, the Commissioner contended that Byman offered no explanation as to why the ALJ should have accepted the opinion of a non-mental health specialist (Dr. Penney) over the opinions of Odden and Dr. Nelsen. Id., p. 17. Additionally, Dr. Penney's opinion was contradicted by the fact that she was working two part-time jobs and Dr. Nelsen's opinion that her ability to handle workplace stress was normal for the stresses of a routine, repetitive three-to-four step or limited detail work setting. Id., p. 17 (citing Tr. 356).

Regarding the ALJ's decision to give great weight to the opinions of the State Agency reviewing doctors, the Commissioner rejected Byman's suggestion that their opinions should be disregarded because they were provided before the record in the case was fully developed. Id., p. 19. At the point that their opinions were rendered, out that two years of medical evidence had been generated and, at any rate, Byman never indicated how the records that post-dated these physicians' opinions would have changed their opinions. Id.

Finally, the Commissioner argued that the ALJ's determinations regarding Byman's credibility were well supported by evidence in the record, including Byman's own testimony regarding her level of pain. Id., p. 20.

## A. The ALJ's Credibility Determinations

A major factor in the ALJ's decision to give only "some" weight the opinions of Byman's treating physicians was that their opinions regarding Byman's level of impairment were inconsistent with her admitted level of activities of daily living and her work history, including her history of work past her alleged onset date. (Tr. 13, 21-22). Therefore, the Court must determine if the ALJ committed error both in his weighing of the medical evidence and in his determinations regarding the credibility of Byman's assertion that she is so impaired that she cannot work.

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)). The Polaski factors require the ALJ to fully consider all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency, and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness, and side effects of medication; and
5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207. The ALJ may consider

whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of Plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).) For example, the ALJ may find a claimant's subjective complaints "inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207. If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

"It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Id. On the other hand, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

"[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)). "After all, it is the 'statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant.'" Id. at 589-90 (quoting Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004)).

As a preliminary matter and as previously noted, the ALJ was not required to use the words "Polaski factors" in order for his analysis to be correct under the Pokaski framework. Without labeling it a "Polaski analysis," the ALJ clearly considered Byman's claims within the Polaski framework. The ALJ considered the totality of the evidence, including Byman's self-reported activities of daily living, (Tr. 18, 22), the nature of her pain, (Tr. 17-18), Byman's medical history and medications, (Tr. 17-21), and Byman's functional restrictions. Tr. 23-24. Specifically, the ALJ found that Byman's described daily activities were not as limited as one would expect, given her subjective complaints of pain and limitations. (Tr. 22). In support, the ALJ cited Byman's ability to care for herself, perform household chores and spend time with her teenage son. (Tr. 18, 22). In addition, although not specifically referenced by the ALJ, there was evidence in the record indicating that Byman exercised by walking daily, (Tr. 271), drove long distances to return her younger son to Detroit Lakes after his weekend visitation, (Tr. 73), and provided an array of services to meet her client's physical needs (Tr. 53-54).

"Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001); see also, Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (acts that are inconsistent with a claimant's subjective complaints of pain reflect negatively on the claimant's credibility);

Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (an ALJ may discredit complaints that are inconsistent with daily activities); Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) ("[D]aily activities alone do not disprove disability, [but] they are a factor to consider in evaluating subjective complaints of pain."); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) ("Inconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility.").  Daily activities that the Eighth Circuit has found contradict disabling pain include: taking care of personal needs and grooming, caring for a pet, preparing meals, doing laundry, changing sheets, house cleaning, ironing, vacuuming, washing dishes, driving, running errands, going out alone, taking out trash, washing a car, shopping, managing finances, watching television, and reading self-help books, (Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)); regularly cleaning one's house, (Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir.1997)); cooking, shopping and driving, (Medhaug, 578 F.3d at 816; Chamberlain v. Shalala, 47 F. 3d 1489, 1494 (8th Cir. 1995)); limited grocery shopping, driving short distances, attending doctor's appointments, cooking meals in a microwave, and sewing.  Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir.1996).  Even if the ALJ overstated Byman's ability to engage in normal activities of daily living, the record as a whole supports his determination regarding the extent of her daily activities.  The Court will not disturb those findings.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) ("Although the ALJ may have overstated [the claimant's] daily activities, the record indicates that [the claimant] is generally able to care for himself.").

Further, when the ALJ asked Byman to rate her pain on a scale of 1 to 10, with "10" requiring emergency room care, Byman told the ALJ that her pain was "always" a "10" before her back surgery and a "7" after her back surgery.  (Tr. 62).  In light of the

fact that the Byman testified that she only went to the emergency room "once or twice" during the time she rated her pain a "10," the ALJ could reasonably conclude that Byman's descriptions of her past and present symptoms were not entirely credible.

The ALJ also noted Byman's work history beyond the date of her alleged onset of disability. (Tr. 22). Not only was Byman working, but in May and October 2009, she took on extra shifts at her home aide job. (Tr. 57). The ALJ appropriately noted that while Byman's work after her alleged onset date did not constitute substantial gainful activity, it was indicative of her ability to work, albeit with a reduced RFC. (Tr. 22).

This Court will not substitute its opinion for the ALJ's determination regarding Byman's credibility in light of the fact that the ALJ made specific findings regarding the factors that entered into his decision to find Byman's subjective complaints not wholly credible and these findings were supported by the record. Under these circumstance, the Court finds no reason to disturb the ALJ's credibility findings.

### B. <u>Weighing of Medical Opinions</u>

"Generally, '[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" <u>Renstrom v. Astrue</u>, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting <u>Perkins v. Astrue</u>, 648 F.3d 892, 897 (8th Cir. 2011)). "However, [a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." <u>Id.</u> (internal quotation marks and citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." <u>Id.</u> If the ALJ does not grant controlling weight to the

treating physician's opinion, the ALJ must determine how much weight to grant a non-controlling medical opinion. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

In addition, the ALJ must give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermined the credibility of such opinions." Goff, 421 F.3d at 790 (internal quotations omitted). At the end of the day, it is the "province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals." Lundgren v. Astrue, Civ. No. 09-3395 (RHK/LIB), 2011 WL 882084 at *12 (D. Minn., Feb. 7, 2011) (Report and Recommendation adopted by Lundgren v. Astrue, 2011 WL 883094 at *1 (D. Minn., Mar. 11, 2011) (citing Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")). .

As a threshold matter, this Court observes that the ALJ did not "dismiss" or "reject" the opinions of Drs. Steinke, Penney and Eichler. See Pl. Mem., pp. 14, 16. To the contrary, the ALJ gave the opinions of Dr. Steinke and Dr. Eichler "some" weight and Dr. Penney's opinion "little weight." (Tr. 21).

Until Dr. Steinke completed his RFC assessment of Byman on February 1, 2011 (six days before the administrative hearing), he had never opined on Byman's ability to work, had never imposed any work restrictions on her, and had never questioned her ability to care for herself or her household. His explanation in support of the exertional limitations he placed on Byman was that she experienced "low and mid back pain" with the exertional activities, suffered from degenerative disc disease, thoracic compression

fracture and scoloisis, and recently had L3 right laminectomy and discectomy, (Tr. 912), facts which are not in dispute in this case. Dr. Steinke did not address or attempt to reconcile Byman's reported activities of daily living with his RFC assessment, even though by the time he submitted it, the record was fully developed and he would have had an opportunity to review the entirety of Byman's medical and social history. Furthermore, in rendering his opinion, Dr. Steinke did not attempt to reconcile his own previous observations of Byman with that recommendation. For example, on July 16, 2009, Byman reported "severe and disabling" pain to Steinke, and rated her pain as "10," although Dr. Steinke also observed that Byman was simultaneously working two jobs. (Tr. 485). This Court agrees with the ALJ that Dr. Steinke's opinion was undermined by Byman's daily living activities and, therefore, finds no error in the ALJ's decision to give Dr. Steinke's opinion "some," but not controlling weight.

Similarly, Dr. Penney's opinion that Byman could not drive and could not handle even a low stress job is unsupported by the evidence in the record. Dr. Penney's opinion that Byman could not drive appeared to be based entirely on Byman's self-reported seizure on January 21, 2011, which is not medically documented and which he questioned. (Tr. 902, 904). There is no evidence in the record that Byman sought medical intervention for this alleged seizure, and despite Dr. Penney's opinion, she testified at the hearing that she was driving. (Tr. 73, 77-78). In addition, there was no other evidence in the record to support Dr. Penney's statement that Byman could not handle even a low stress job (while noting in the same assessment that Byman would not have to take any unscheduled breaks during an eight-hour work day). (Tr. 905). Odden, the consulting examiner, opined that Byman could handle the stress of an entry level job. (Tr. 450). Dr. Nelsen, based on his review of the records, also opined that

Byman's ability to handle stress was adequate for the normal stresses of a routine, repetitive, 3-4 step or limited detail work. (Tr. 356). Odden and Dr. Nelsen are mental health practitioners, whose opinions under the SSA regulations are entitled to greater weight than Dr. Penney's opinion on the issue of Byman's ability to handle workplace stress. 20 C.F.R. § 404.1527 (c)(5)("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Additionally, both Odden's and Dr. Nelsen's opinions are consistent with the record as a whole, particularly Byman's extensive work history. On this basis, this Court finds no error in the ALJ's decision regarding the weight to give Dr. Penney's opinion.

The ALJ gave Dr. Eichler's opinion that Byman could stand for less than two hours a day only "some" weight because that opinion conflicted with Byman's work as a cashier, during which she stood for her entire two or four-hour shift. (Tr. 21). On July 5, 2009, Byman reported that she stood for her entire four-hour shift as a cashier. (Tr. 280-287). At the hearing, Byman testified that she went from a four-hour shift to a two-hour shift on her cashier's job, thus working four hours per week. (Tr. 55-56). This Court finds no error in the ALJ's decision to give only some weight to Dr. Eichler's opinion because, like Dr. Penney's opinion and Dr. Steinke' opinion, it was not supported by the record as a whole.

On the one hand, the ALJ had before him the opinions of State Agency consulting physicians Dr. Paule, Dr. Nelsen, Dr. Alsdurf, Dr. Larson and Odden, none of whom had concluded that Byman was unable to work because of her disabilities. The only limitation State Agency's examining consultant physician, Dr. Yohe, placed on Byman was that she could not work around hazards and was limited in her ability to

41

carry more than ten pounds. (Tr. 446). On the other hand, the ALJ had the opinions of three treating physicians that Byman was substantially more impaired in her functionality, although their opinions were either not supported by any medical evidence (Dr. Penney's opinion) or were contradicted by the evidence in the record as a whole. The Social Security regulations recognize State Agency consultants as "highly qualified" and "expert" in Social Security disability determinations. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). In light of the totality of the evidence, the Court finds no error in the way in which the ALJ considered and weighed the medical evidence and the opinions of the physicians who treated and examined Byman, and those who did not. The ALJ's decision was reasonable and based on the substantial record as a whole and it should not be disturbed.

## VII.    CONCLUSION

In rendering his decision, the ALJ carefully considered Byman's voluminous medical record, including the opinions of her treating physicians and State Agency consultants, along with her self-reports and testimony. The ALJ properly weighed the opinions of the treating physicians and State Agency examining and non-examining consultants, and performed the credibility analysis required by the SSA regulations and Polaski. On this basis, this Court concludes that there was substantial evidence in the record to support the ALJ's conclusion that Byman was not disabled.

**VIII.  RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 10] be **DENIED**; and

2.     Defendant's Motion for Summary Judgment [Docket No. 15] be

       **GRANTED**.


Dated:        February 15, 2013

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United State Magistrate Judge


<u>**NOTICE**</u>

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 1, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.